IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**DUGAN CALVIN RUSSELL**                                            **PLAINTIFF**

V.                                                    NO. 3:13-CV-00030-DMB-JMV

**ALLIANZ LIFE INSURANCE
COMPANY OF NORTH AMERICA;
LTCAMERICA INSURANCE
COMPANY; LIFE INSURANCE USA
COMPANY; and XYZ CORPORATIONS
1-50**                                                              **DEFENDANTS**

**MEMORANDUM OPINION AND
ORDER GRANTING IN PART MOTION TO DISMISS**

  This is a breach of contract action arising from the termination of an agent relationship between Plaintiff Dugan Calvin Russell and Defendants Allianz Life Insurance Company of North America ("Allianz NA"), LTCAmerica Insurance Company ("LTCAmerica"), and Life Insurance USA Company ("Life Insurance USA"). Before the Court is the motion to dismiss of the defendants (collectively, "Allianz"), made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] Doc. #62.

**I
Motion to Dismiss Standard**

  As a general matter, "[a] pleading that states a claim for relief must contain … a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a complaint falls short of this directive, a defendant may move to dismiss the claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In

---

[1] Russell alleges that LTCAmerica and Life Insurance USA are both subsidiaries of Allianz. Doc. #36 at ¶¶ 3–4.

considering the interplay between Rule 8 and Rule 12, the United States Supreme Court has explained that:

> To survive a motion to dismiss [for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and punctuation omitted) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–58 (2007)). Under this standard, a "court must accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 803 n.44 (5th Cir. 2011) (internal quotation marks and punctuation omitted).

## II
## Factual Allegations

### A. Agency Agreement

On March 27, 2000, Russell entered into an "Agent Agreement" ("Agreement") with Allianz. Doc. #36 at ¶ 6. The Agreement provided that Russell would act as Allianz's "agent/broker … to represent [it] in connection with [its] long term care insurance and health products …." Doc. #36 at Ex. A. To this end, the Agreement explained that Russell would be "deemed to have a separate contract enforceable by and against each of the Companies." *Id*.

Of relevance to this action, the Agreement contained the following provisions:

**FREEDOM OF CHOICE.** You are free to contract with other insurance companies.

\* \* \*

**TRUST.** Both parties understand that each occupies a position of trust and confidence in dealings with each other, and each party agrees to act in accordance with the highest ethical and fiduciary standards when dealing with the other.

\* \* \*

**TERMINATION WITHOUT CAUSE.** Termination without cause will not impair any contractual right to vested commissions. This Agreement will be terminated without cause … by either party giving written notice, at least thirty (30) days prior to the date of termination, mailed or delivered to the last known address.

\* \* \*

**TERMINATION FOR CAUSE.** This Agreement will be terminated for cause, if you … misrepresent or omit any material information on an application for, or reinstatement of, our policy [or] commit or attempt to commit fraud against us [or] repeatedly fail to comply with material terms of this Agreement, or our stated rules and regulations [or] falsify or omit material information provided to us …. A termination for cause will be effective upon your conviction of a felony, or revocation of your license, or upon the Company sending you a written notice of termination which specifies the reason for termination for cause.

\* \* \*

**GENERAL PROVISIONS** … This agreement is governed by the laws of the State of Minnesota.

Doc. #36 at Ex. A.

Allianz's rules and regulations, in turn, provided that "Agents may not [s]ign applications or other forms on behalf of another person. This includes situations where the other person has granted verbal or written permission to do so."[2] Doc. #63-1.

The Agreement was signed by Russell and representatives from Life Insurance USA and Allianz NA. Doc. #36 at Ex. A.

---

[2] Allianz attached a portion of the rules and regulations, which were referenced in the complaint, to its motion to dismiss. The Court will consider this document for the purpose of deciding the motion. *See Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) ("The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.").

### B. Complaint and Termination

In 2009, Russell "began to experience various problems with Allianz, ranging from their paying the wrong beneficiaries on policies to sending out the wrong 1099's." Doc. #36 at ¶ 9. Sometime later, Russell, "seeing how [the] changed method of doing business was affecting customers and policy holders, expressed his unhappiness with the situation to Allianz, specifically with Allianz Chief Investigator and CFO Gary Romo." *Id*. This conversation inspired Allianz "to get rid of [Russell] as an agent [and to] intentionally damage his business." *Id*.

On January 28, 2011, Allianz NA sent Russell a letter stating that "[w]e regret to inform you that effective 01/28/2011, your appointment and/or Agent Agreement with Allianz Life Insurance Company of North America has been terminated for cause." Doc. #36 at Ex. B. The letter did not identify the "cause" for which Russell was terminated. Russell received the termination letter on January 28, 2011. *Id*. at ¶ 10.

Russell contacted Romo and requested that Romo "put in writing why the Agreement had been terminated for cause." *Id*. at ¶ 11. Romo replied "that would never happen." *Id*.

Following the termination letter, Allianz "filed a report or complaint" about Russell with the Commissioners of Insurance for the states of Mississippi and Arkansas. *Id*. at ¶ 12. In May 2011, Russell received a letter from Chief Investigator Mary Coney of the Arkansas Insurance Department. Doc. #36 at Ex. C. The letter stated that:

> The Arkansas Insurance Department received information from Allianz that they had cancelled your appointment with them "for cause." I request that you furnish the Arkansas Insurance Department a written explanation regarding the allegation that you cut and pasted client signatures and dates and/or forged client signatures and dates.

*Id*.

4

On August 4, 2011, Allianz sent Russell's Allianz clients a letter informing them of Russell's termination. *Id.* at Ex. D. The letter did not state the reason for Russell's termination. *Id.*

On August 12, 2011, Romo wrote to the Mississippi Insurance Department that:

> Per your request, I am providing you with a summary of the concerns we experienced with Mr. Russell which led to termination with cause of his Allianz appointment and contract.
>
> 1. Donald Bentley Complaint, received July 8, 2010. Findings include … Russell admitted to signing Mr. Bentley's signature on his delivery receipt …. Russell initially stated that Mr. Bentley signed the receipt …. Russell did not deliver Mr. Bentley's policy on the date indicated on the receipt. In fact, Russell did not deliver the policy on any date ….
> 2. Russell altered the date on an application to make it appear as if a new signature was obtained [for] Audra Gaines ….
> 3. Russell altered the date on an application and replacement form to make it appear as if new signatures were obtained [for] Kay Steele …. This is especially concerning due to the fact that we mailed Mr. Russell a warning letter on September 3, 2010, explaining that any further occurrences of altering dates on a document could impact his Allianz appointment.

Doc. #36 at Ex. E.

On October 19, 2011, Romo sent Russell a letter stating: "You have requested the reason for your termination with cause. The reason is [you c]ommitt[e]d or attempt[ed] to commit fraud against us." *Id.* at Ex. F.

Following the purported termination, Gaines and Steele executed affidavits averring that the August 12, 2011, allegations concerning their respective policies were "incorrect." *Id.* at Exs. G & H. Bentley executed an affidavit stating, in essence, that while Russell signed a form on behalf of Bentley, he did so with Bentley's permission. *Id.* at Ex. I. Bentley's also asserted that the annuities purchased by virtue of Russell's signature were not what Bentley wanted, but that the mistake was a miscommunication and not fraud. *Id.*

5

### C. This Action

Russell filed this action in the Circuit Court of Desoto County. On February 1, 2013, Allianz timely removed the case to this Court. Doc. #1. Russell filed an amended complaint on June 10, 2013. Doc. #36. Russell's amended complaint asserts claims for: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) breach of fiduciary duty; and (4) "intentional interference with business relations." *Id.*

Russell alleges that, as a result of Allianz's actions, he suffered the following damages: (1) "[a]nnual income in the amount of $127,000;" (2) "[l]oss of Renewal income and updated records on over 400 clients that the Plaintiff lost;" (3) [l]oss of a contract with American Equity and North American Life;" (4) "[l]oss of ability to gain similar agency status with other firms, including Liberty Bankers Life, which refused to give the Plaintiff a license because of his termination for cause, and the filing of the Complaints or reports with the State Department of Insurance in Mississippi and Arkansas;" (5) "[l]oss of reputation in the annuities and insurance community;" and (6) "emotional distress." Doc. #36 at ¶ 25.

### III
### Choice of Law

As explained above, the Agreement contains a choice of law clause designating Minnesota law as controlling. "[A] federal court exercising diversity jurisdiction typically applies the choice of law rules of the forum state." *Jackson v. W. Telemarketing Corp. Outbound*, 245 F.3d 518, 522 (5th Cir. 2001). Generally, Mississippi courts will enforce a choice of law provision unless:

> the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or … application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the

particular issue and which … would be the state of the applicable law in the absence of an effective choice of law by the parties.

*PIC Group, Inc. v. LandCoast Insulation, Inc.*, 718 F.Supp.2d 795, 799–800 (S.D. Miss. 2010) (quoting Restatement (Second) of Conflict of Laws § 187(2) (1971)). Here, Allianz NA, LTCAmerica and Life Insurance USA all have their principal places of business in Minnesota. Doc. #36 at ¶¶ 2–4. Accordingly, this Court will enforce the Minnesota choice of law provision. *See Garrett Const., Inc. v. Ashbritt, Inc.*, No. 1:09-cv-379, 2010 WL 583921, at *2 (S.D. Miss. Feb. 16, 2010) ("Under Mississippi law … Florida is the location of Ashbritt's main office and principal place of business and the Court finds that this constitutes a reasonable basis for the selection of Florida law to apply to the contract." (citing *Kiefer v. Harris*, 125 F.3d 852 (5th Cir. 1997)).

Under Mississippi law, where a choice of law provision states an agreement is "governed by" the laws of another state, the law of the selected state applies to contract based claims while tort claims are governed by Mississippi law. *Cypress Pharm., Inc. v. CRS Management, Inc.*, 827 F.Supp.2d 710, 723–24 (S.D. Miss. 2011). Accordingly, the Court will apply Minnesota law to the claims for breach of contract and breach of the covenant of good faith and fair dealing. *See Braidfoot v. William Carey Coll.*, 793 So.2d 642, 651 (Miss. 2000) ("breach of a duty of fair dealing … emanates from the law on contracts"); *Bobby Kitchens, Inc. v. Mississippi Ins. Guar. Ass'n*, 560 So.2d 129, 134–35 (Miss. 1989) ("[T]he 'tort' of 'breach of an implied duty of good faith and fair dealing' … is not a tort in the general sense."). In contrast, the claims for breach of fiduciary duty and intentional interference with business will be analyzed under Mississippi law. *See Union Nat. Life Ins. Co. v. Crosby*, 870 So.2d 1175, 1180 (Miss. 2004) ("A claim of breach of fiduciary duty is appropriately recognized as an action in tort, not contract." (internal quotation marks omitted)); *see also Protective Serv. Life Ins. Co. v. Carter*, 445 So.2d 215, 216

7

(Miss. 1983) ("wrongful or malicious interference with … the right to pursue a lawful business … generally constitutes a tort").

# IV
# Analysis

### A. Breach of Contract

Under Minnesota law, "[i]n order to state a claim for breach of contract, the plaintiff must show (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).

Allianz argues that Russell's breach of contract claim must fail because Russell "breached his agreement with Allianz and attempted to defraud Allianz on more than one instance." Doc. #63 at 8. Russell responds that Allianz breached the Agreement by: (1) attempting to terminate him for cause without stating the reason for his termination; and (2) attempting to terminate him for fraud even though no fraud occurred.[3] Doc. #71 at 6–7.

#### 1. Notice of Termination

"A contract may provide the manner or time frame in which a party is required to give the other party notice of breach of the contract." *Valspar Refinish, Inc. v. Gaylord's Inc.*, 764 N.W.2d 359, 365 (Minn. 2009). Pursuant to the Agreement, a termination for cause would not be effective until: (1) Russell was convicted of a felony; (2) Russell had his insurance license revoked; or (3) Allianz sent Russell a written notice of termination which specifies the reason for termination for cause. Accordingly, as pled, Russell's termination was not effective until

---

[3] The Agreement was not signed by a representative of LTCAmerica. Furthermore, the notice of termination only purported to terminate the Agreement on behalf of Allianz NA. *See* Doc. #36 at Ex. B. Additionally, most correspondence attached to Russell's complaint purports to be on behalf of Allianz NA, without reference to the other Allianz entities. Nevertheless, the complaint and both parties have treated the alleged wrongful acts as if made on behalf of all entities. This Court will do the same for the purpose of deciding this motion to dismiss.

8

October 19, 2011, when Romo informed him that he was terminated for fraud. Nevertheless, prior to the effective date of Russell's termination, Allianz revoked his ability to act as an agent pursuant to the Agreement. Doc. #36 at ¶ 14.

Based on these allegations, the Court concludes that Russell has pled the existence of a contract (the Agreement) and a breach of such contract (Allianz's termination of the Agreement prior to meeting the requirements for termination). There is no indication that the breached notice provision was dependent on a condition precedent. Accordingly, dismissal of the breach of contract claim is improper. *See Midwest Sports Mktg., Inc. v. Hillerich & Bradsby of Canada, Ltd.*, 552 N.W.2d 254, 267 (Minn. Ct. App. 1996) (summary judgment against plaintiff inappropriate where defendant failed to comply with contractually required termination notice).

### 2. Fraud

Russell also argues that his termination for "fraud" against Allianz was a breach because he did not commit "fraud" within the meaning of the contract. Doc. #71 at 6–7.

When interpreting a contract, Minnesota courts "look to its language to determine the parties' intent. In other words, where there is a written instrument, the intent of the parties is determined from the plain language of the instrument itself. Accordingly, [courts] assign unambiguous contract language its plain meaning." *Savela v. City of Duluth*, 806 N.W.2d 793, 796–97 (Minn. 2011) (internal punctuation and citations omitted). In ascertaining a term's plain meaning, a court may consider "dictionary definitions" and *Black's Law Dictionary*. *State v. Weayaus*, 836 N.W.2d 579, 583 (Minn. Ct. App. 2013).

The Agreement does not define or elaborate on the meaning of fraud as used in its termination for cause section. *Black's Law Dictionary* defines fraud as "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or

her detriment." *Black's Law Dictionary* (9th ed. 2009), fraud. *Oxford English Dictionary*, in turn, defines the term as the use "of false representations to obtain an unjust advantage or to injure the rights or interests of another." *Oxford English Dictionary Online*, www.oed.com (last visited Aug. 28, 2014) (search for "fraud, n."). In light of these definitions, the Court concludes that the plain meaning of fraud as used in the Agreement is: (1) a knowing misrepresentation or concealment of a material fact; (2) made to gain an unjust advantage or to induce another to act to its detriment.

Based on the allegations and documents before the Court, Russell was terminated for "fraud" based upon his allegedly misrepresenting the signee of a document and altering dates and signatures on relevant forms.[4] As an initial matter, it appears that, in executing the Agreement, the parties differentiated between misrepresentations on application forms and fraud. In providing the justifications for terminations for cause, the Agreement listed: misrepresentations on applications for policies, falsifying material information provided to Allianz, and the commission or attempted commission of fraud. If making misrepresentations on policy forms constituted fraud, then at least one of the foregoing provisions would be superfluous. Minnesota law counsels against interpretations of contracts that render provisions superfluous. *See Econ. Premier Assur. Co. v. W. Nat. Mut. Ins. Co.*, 839 N.W.2d 749, 756 (Minn. Ct. App. 2013) ("If the truck fits both classifications, at least one contract provision is rendered superfluous, a rendering our interpretation should avoid if possible."). Accordingly the Court concludes that,

---

[4] In its reply brief, Allianz argues that "the fraud committed, and for which Allianz terminated the Agent Agreement, is based on Plaintiff's misleading Allianz in its investigation, and his attempts to cover up his repeated violations of important Allianz policies and procedures." Doc. #76 at 5. While the August 2011 letter to the Mississippi Insurance Department referenced that "Russell initially stated that Mr. Bentley signed the receipt," the Court has been unable to find anything in the pleadings or attached documents that shows Russell was terminated for any type of "cover-up." Indeed, it appears that Allianz informed the Arkansas Insurance Department that Russell was terminated for cutting and pasting client signatures and dates. Doc. # 36 at Ex. C. In the absence of any indication to the contrary, the Court, for the purposes of deciding the motion to dismiss, draws the reasonable inference that Russell was terminated for the reasons set forth in the Arkansas Insurance Department letter.

pursuant to the Agreement, misrepresentations on application forms (without more) do not rise to the level of "fraud." Because, as pled, Allianz terminated Russell for making misrepresentations on policy documents, he could not have been terminated for "fraud" under the Agreement.

Furthermore, even if misrepresenting information on policy forms could be deemed "fraud" under the Agreement, dismissal at this stage would still be inappropriate. Viewing the allegations in the light most favorable to Russell, the Court concludes that it is facially plausible that the statements were made for reasons other than to induce Allianz to perform a self-detrimental act or for Russell to gain an "unjust" advantage, and thus could be found to not constitute "fraud" within the meaning of the Agreement. Indeed, Russell specifically pled that he did not attempt to defraud Allianz. Doc. #36 at ¶ 21. Taking this allegation as true (as it must), the Court cannot conclude that it is facially implausible that Russell did not commit fraud within the meaning of the Agreement. Accordingly, as pled, Allianz breached the Agreement by terminating Russell for fraud and the motion to dismiss must be denied in this regard. *See Twombly*, 550 U.S. at 556 ("a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely'").

### B. Implied Covenant of Good Faith and Fair Dealing

"Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract." *In re Hennepin Cnty.1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn.1995) (quotation omitted). This covenant "prohibits a party from failing to perform for the purpose of thwarting the other party's rights under the contract." *Team Nursing Servs., Inc. v. Evangelical Luthern Good Samaritan Soc.*, 433 F.3d 637, 641–42 (8th Cir. 2006) (citing *Coddon v.*

11

*Youngkrantz*, 562 N.W.2d 39, 43 (Minn. Ct. App. 1997)). To establish a violation of the implied covenant of good faith and fair dealing, "a party must establish bad faith by demonstrating that the adverse party ha[d] an ulterior motive for its refusal to perform a contractual duty." *Minnwest Bank Cent. v. Flagship Props. LLC*, 689 N.W.2d 295, 303 (Minn. Ct. App. 2004). Allianz argues that Russell has failed to plead it acted with bad faith. In his response brief, Russell focuses on the fact that he was terminated for fraud and that he did not commit fraud.

As alleged, Allianz improperly terminated Russell's contract for "fraud" with the purpose of "intentionally damag[ing] his business." Doc. #36 at ¶¶ 9, 21. Taking this allegation as true, the Court concludes that Russell has properly pled a claim for violation of the implied covenant of good faith and fair dealing.

**C. Breach of Fiduciary Duty**

In order to state a claim for breach of fiduciary duty under Mississippi law, a plaintiff must allege the existence of a fiduciary duty and a breach of such duty. *See Lowery v. Guar. Bank and Trust Co.*, 592 So.2d 79, 83 (Miss. 1991) ("A fiduciary duty must exist before a breach of the duty can occur."). Generally, a fiduciary relationship may be "created by contract [or] may arise from an informal relationship where both parties understand that a special trust and confidence has been reposed." *Burgess v. Bankplus*, 830 So.2d 1223, 1227 (Miss. 2002). Allianz challenges only the first requirement – the existence of a fiduciary relationship.[5] Russell responds that a fiduciary relationship was created by contract. Doc. #71 at 12.

"The existence of fiduciary duties depends on the facts of a particular relationship. Usually, therefore, a claim alleging the existence of a fiduciary duty is not subject to dismissal in

---

[5] In its reply brief, Allianz also argues that Russell failed to allege a breach of a fiduciary duty. Doc. #76 at 7–10. However, "the court may not consider a new argument made for the first time in a reply. *Cross v. Senior Living Props., LLC*, at *1 n.1 (N.D. Tex. Feb. 19, 2008).

a 12(b)(6) motion, given the generous pleading standard established in Fed.R.Civ.P. 8." *Boley v. Pineloch Assocs., Ltd.*, 700 F.Supp. 673, 680–81 (S.D.N.Y. 1998) (internal footnotes omitted).

With regard to contractual fiduciary relationships, the Mississippi Supreme Court has held that:

> Although every contractual agreement does not give rise to a fiduciary relationship, such relationship may exist under the following circumstances: (1) the activities of the parties go beyond their operating on their own behalf, and the activities for the benefit of both; (2) where the parties have a common interest and profit from the activities of the other; (3) where the parties repose trust in one another; and (4) where one party has dominion or control over the other.

*Hopewell Enters., Inc. v. Trustmark Nat. Bank*, 680 So.2d 812, 816 (Miss. 1996). "While Mississippi law does not require any 'magic words,' there must be evidence that both parties understood that a special trust and confidence was being reposed." *Mabus v. St. James Episcopal Church*, 884 So.2d 747, 758 (Miss. 2004). In this regard, a "fiduciary [duty] may exist when there is a relationship wherein one person is in a position to exercise a dominant influence upon another, arising either from weakness of mind or body, or through trust." *Roman Catholic Diocese of Jackson v. Morrison*, 905 So.2d 1213, 1239 (Miss. 2005).

At least one court in this state has treated the four *Hopewell* "circumstances" as "four factors that might convert a standard contractual relationship to one fiduciary in character." *Ward v. Life Investors Ins. Co. of Am.*, 383 F.Supp.2d 882, 886–87 (S.D. Miss. 2005). Employing this "factor" test, the district court in *Ward* held that, in the absence of a "contract that … indicates [a] desire[] to be bound in a fiduciary relationship," insurance agents are not in fiduciary relationships with insurance companies they contract with because such agents are not "under the dominion and control of the company …." *Id*. at 887.

In arguing that it did not owe Russell a fiduciary duty, Allianz relies on an array of cases in which courts declined to find a fiduciary duty between either brokers and principals or lenders

13

and lendees. *See* Doc. #63 at 14 (citing *Ward*, 383 F.Supp.2d at 887; *In re Koelfgen*, 87 B.R. 993, 997 (Bankr. D. Minn. 1998); *Furr Mktg. Inc. v. Orval Kent Food Co., Inc.*, 682 F.Supp. 884, 886 (S.D. Miss. 1988); *Shaffer v. Guardian Life Ins. Co. of Am.*, 986 F.Supp. 1066, 1068 (S.D. Tex. 1997); and *H Enters. Intern. Inc. v. Gen. Elec. Capital Corp.*, 833 F.Supp. 1405, 1422 (D. Minn. 1993)). However, of relevance here, none of the cited cases involved an express assumption of fiduciary standards. Indeed, two of the cases expressly noted the absence of such a provision. *Ward*, 383 F.Supp.2d at 887 ("There is nothing in the contract that is before this Court that indicates Life Investors desires to be bound in a fiduciary relationship to the plaintiffs."); *In re Koelfgen*, 87 B.R. at 997 ("There is nothing in the contract which would indicate that there was an express or technical trust.").

Here, the Agreement expressly acknowledged that "*[b]oth parties understand that each occupies a position of trust* and confidence in dealings with each other, and *each party agrees to act in accordance with the highest ethical and **fiduciary** standards* when dealing with the other." Doc. #36 at Ex. B (emphases added). Thus, in addition to reposing trust between the parties, the Agreement expressly acknowledged that the parties must act "in accordance with … fiduciary standards."

Unlike the cases cited by Allianz, the parties expressly placed a high degree of trust in each other and covenanted to act in accordance with fiduciary standards. The Court concludes that the express assumption of "a position of trust" and "fiduciary standards" placed the parties in a position to exercise a dominant influence upon each other, with such dominance arising from trust reposed by a mutual assumption of fiduciary duties. Accordingly, Russell has adequately pled the existence of a fiduciary relationship. *Morrison*, 905 So.2d at 1239; *see also Pentech Pharms, Inc. v. Par Pharm., Inc.*, No. 04-c-3149, 2004 WL 2390088, at *3 (N.D. Ill. Oct. 21,

2004) ("*absent an express provision*, parties that deal with each other at arms length generally do not enjoy a fiduciary relationship") (emphasis added).

### D. Tortious Interference with Business Relations

A claim for tortious interference with business relations arises from "interfer[ence] with a prospective business advantage." *AmSouth Bank v. Gupta*, 838 So.2d 205, 214 (Miss. 2002). "There are four elements necessary to prove a claim of tortious interference with a business relationship: (1) The acts were intentional and willful; (2) The acts were calculated to cause damage to the plaintiffs in their lawful business; (3) The acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); (4) Actual damage and loss resulted." *Biglane v. Under the Hill Corp.*, 949 So.2d 9, 15–16 (Miss. 2007). To establish damages arising from a "prospective relationship," a plaintiff must allege a "reasonable likelihood that the relationship [would have] come into existence." *Ward*, 383 F.Supp.2d at 888.

In its motion to dismiss, Allianz argues that Russell's tortious interference claim must fail because: (1) "[t]here is no cause of action for interference by a former agent against an insurance company regarding the company's business relationships or contracts with its own customers or clients;" (2) the "allegations that Allianz sent notices to affected customers that Plaintiff was no longer authorized to act as Allianz's agent regarding their Allianz policies, cannot form the basis of a tort of any kind [because t]he statement was completely true, and Plaintiff does not allege otherwise;" and (3) "Allianz was required by statute to report [the termination] to its customers."[6] Doc. #63 at 15 (emphasis omitted).

---

[6] Allianz, citing to Minnesota case law, also argues that "the tortious interference claim is also barred by the economic loss doctrine." Doc. #63 at 18. However, in tortious interference claims, "[r]ecovery for stand-alone economic injury is clearly permitted … under Mississippi law." Mississippi Law of Torts § 18:26 (2d ed.).

15

In his response to the motion to dismiss, Russell argues that he has stated a claim for tortious interference because the "wrongful termination on the part of [Allianz] damaged [his] ability to sell insurance products for other companies, and harmed existing relationships with long-time customers who bought products [Russell] sold on behalf of [Allianz], as well as prospective customers." Doc. #71 at 15. Thus, Russell appears to argue that Allianz interfered with three types of business relationships: (1) those between Russell and his customers; (2) those between Russell and other insurance companies; and (3) those between Russell and potential future customers.

As to Russell's argument regarding damages arising from loss of prospective business from his former clients and prospective customers, "[i]t is without question that Mississippi recognizes the claim of tortious interference with a business relationship, which 'occurs when a person unlawfully diverts prospective customers away from one's business.'" *Unified Brands, Inc v. Teders*, 868 F.Supp.2d 572, 578 (S.D. Miss. 2012) (quoting *Par Indus., Inc. v. Target Container Co.*, 708 So.2d 44, 48 (Miss. 1998)). However, despite the allegations in his response brief, Russell has not pled that Allianz's actions diverted customers. In the absence of such allegations, the Court cannot reasonably infer that there was a "reasonable likelihood" that the allegedly lost relationships would have come into existence.[7] *Ward*, 383 F.Supp.2d at 888.

In contrast to the non-existent allegations regarding lost customers, Russell pled that: (1) Allianz terminated him for cause; (2) such termination was done to intentionally damage his business; (3) the termination was done without right; and (4) due to the termination, he lost two contracts, and was unable to "gain a similar agency status" with another company. These

---

[7] Although apparently not raised in the response brief, to the extent Russell's complaint seeks to recover for loss of renewal commissions from his former clients, such claim must fail because renewal payments are "derivative of a contract between [Allianz] and the insured," and thus, Russell "had no independent business relationship with which [Allianz] could have interfered." *Ward*, 383 F.Supp.2d at 889.

16

allegations are sufficient to state a claim for tortious interference. *See Biglane*, 949 So.2d at 15–16; *see also Weber v. FujiFilm Med. Sys. U.S.A., Inc.*, No. 3:10-cv-401, 2013 WL 6592592, at *3–4 (D. Conn. Dec. 16, 2013) (tortious interference claim recoverable if plaintiff "could show that the designation of his termination as for cause proximately caused his inability to find comparable employment").

## V
## Conclusion

For the reasons set forth above, the motion to dismiss [62] is **GRANTED in Part and DENIED in Part.** The motion is granted as to the claim for tortious interference arising from alleged interference with prospective and former customers. The motion is denied in all other respects.

SO ORDERED, this the 12th day of September, 2014.

/s/ **Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**