**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**DUGAN CALVIN RUSSELL**                                                                 **PLAINTIFF**

**V.**                                                                 **NO. 3:13-CV-00030-DMB-JMV**

**ALLIANZ LIFE INSURANCE
COMPANY OF NORTH AMERICA;
LTCAMERICA INSURANCE
COMPANY; LIFE INSURANCE USA
COMPANY; and XYZ CORPORATIONS
1-50**                                                                 **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This is a breach of contract action arising from the termination of an agency relationship between Plaintiff Dugan Calvin Russell and Defendants Allianz Life Insurance Company of North America, LTCAmerica Insurance Company, and Life Insurance USA Company. Before the Court is the motion for summary judgment of the defendants (collectively, "Allianz"), made pursuant to Rule 56 of the Federal Rules of Civil Procedure. Doc. #111. Having considered the motion and responses thereto, case record, and applicable law, the Court finds that, for the reasons below, Allianz's motion for summary judgment should be granted in part and denied in part.

**I**
<u>**Standard on Summary Judgment**</u>

"Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 22–23 (1986)). To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the

evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Norwegian Bulk Transp. A/S*, 520 F.3d at 411–12 (internal quotation marks and citations omitted). To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id*. at 412.

"If, as here, the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998) (citation omitted). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 191–92 (5th Cir. 2011) (internal punctuation omitted). When considering a motion for summary judgment, the Court views all evidence in the light most favorable to, and "resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## II
## Factual Background

### A.  Agency Agreement

On March 27, 2000, Russell entered into an "Agent Agreement" ("Agreement") with Allianz. Doc. #36 at ¶ 6. The Agreement provided that Russell would act as Allianz's "agent/broker … to represent [it] in connection with [its] long term care insurance and health products …." *Id.* at Ex. A. To this end, the Agreement explained that Russell would be

"deemed to have a separate contract enforceable by and against each of the Companies."  *Id.*

The Agreement was signed by Russell and representatives of Life Insurance USA Company and

Allianz Life Insurance Company of North America.  *Id.*

Of relevance to this action, the Agreement contained the following provisions:

**FREEDOM OF CHOICE.**  You are free to contract with other insurance companies.

\* \* \*

**TRUST.**  Both parties understand that each occupies a position of trust and confidence in dealings with each other, and each party agrees to act in accordance with the highest ethical and fiduciary standards when dealing with the other.

\* \* \*

**TERMINATION WITHOUT CAUSE.**  Termination without cause will not impair any contractual right to vested commissions.  This Agreement will be terminated without cause … by either party giving written notice, at least thirty (30) days prior to the date of termination, mailed or delivered to the last known address.

\* \* \*

**TERMINATION FOR CAUSE.**  This Agreement will be terminated for cause, if you … misrepresent or omit any material information on an application for, or reinstatement of, our policy [or] commit or attempt to commit fraud against us [or] repeatedly fail to comply with material terms of this Agreement, or our stated rules and regulations [or] falsify or omit material information provided to us ….  A termination for cause will be effective upon your conviction of a felony, or revocation of your license, or upon the Company sending you a written notice of termination which specifies the reason for termination for cause.

\* \* \*

**GENERAL PROVISIONS** …  This Agreement is governed by the laws of the State of Minnesota.

Doc. #36 at Ex. A.

Allianz's rules and regulations, in turn, provided that "Agents may not [s]ign applications

or other forms on behalf of another person.  This includes situations where the other person has

granted verbal or written permission to do so." Doc. #111-3 at 10. On September 15, 2008, Russell signed paperwork attesting that he read and understood the rules and regulations. Doc. #111-2 at 32:6-15.

### B. Clients

Pursuant to the Agreement, Russell sold annuities and other Allianz products to his clients until his termination. Doc. #123 at 2. In total, Allianz products constituted eighty percent of his business. Doc. #122-1 at 63:12-16. Of relevance here, Russell sold Allianz products pursuant to the Agreement to three individuals: Donald Bentley, Audra Gaines, and Kay Steele. Doc. #123 at 4.

#### 1. Donald Bentley

In April 2010, Donald Bentley contacted Russell in order to purchase two annuities for Bentley and his wife in the amounts of $6,000 and $5,000, respectively. Doc. #122-4 at ¶ 6. Instead of ordering two separate annuities, Russell placed the money in one annuity with Allianz for $11,000. *Id.* at ¶ 11. When the annuity was delivered, Russell signed the policy delivery receipt on behalf of Bentley. Doc. #123 at 4-5. On June 25, 2010, after reviewing the policy, Bentley contacted Allianz to change the single annuity to two separate annuities, as he originally requested. Doc. #122-4 at ¶ 13; Doc. #122-10.

On June 29, 2010, Gary Romo, Allianz's chief fraud investigator, sent Bentley a copy of the delivery receipt and an affidavit of forgery. Doc. #122-8 at 74:20-21; Doc. #122-10. The affidavit, drafted with Bentley as affiant, stated that "what purports to be my signature [on the receipt] is a forgery. I did not sign [the receipt], nor did I authorize any person to sign [the receipt] on my behalf or otherwise approve of or consent to the signature on [the receipt]." Doc. #122-9. Bentley neither signed the affidavit nor returned it to Romo. Doc. #122-7 at 40:18-21.

On August 19, 2010, Romo sent Russell a letter regarding Bentley's annuities. Doc. #111-10. In the letter, Romo stated that "[Allianz] rel[ies] on the agent to obtain authentic signatures and dates on all policy documents. It is not acceptable for you, or anyone in your office, to sign a document for the policyowner, even if the policyowner authorizes you to do so." *Id*. The same day, Romo wrote in an internal document that the Bentley matter was "not fraud, consumer authorized him to sign the delivery receipt." Doc. #122-10.

### 2. Audra Gaines

In August 2010, Russell sold an Allianz annuity to a new client, Audra Gaines. Gaines signed the original paperwork on August 16, 2010. Doc. #111-12 at ¶ 2. Russell subsequently realized that, while the money to be used to purchase the annuity was located with an insurance company, the application erroneously stated that the money was located in a retirement fund. Doc. #122-1 at 92:16-20. Without consulting Gaines, Russell used white-out to remove the inaccurate information and then wrote in the correct insurance company name, policy number, and Gaines' name before submitting the paperwork to Allianz. *Id.* at 92:22-93:12.

Allianz's New Business Department contacted Russell and requested that he submit new, unaltered paperwork for Gaines' application, which he did on August 26, 2010. Doc. #111-9 at 48:5-9. The Department reviewed the new documents and, suspecting Russell had simply altered the date on the original signature page from "8-16-10" to "8-26-10" and resubmitted it, referred the matter to Allianz's Special Investigative Unit. *Id.* at 48:10-18. On September 2, 2010, Romo informed Russell that it was unacceptable to use white-out or alter dates on annuity application forms. Doc. #122-10 at 4. Russell denied whiting-out, altering, or otherwise changing the date or signature on the August 26 document, which he claimed Gaines properly

executed. Doc. #122-1 at 93:11-12. Allianz never issued a policy to Gaines on either of the applications. Doc. #122-5 at ¶ 7.

### 3. Kay Steele

In December 2010, Russell sold an Allianz annuity to another new client, Kay Steele. By fax, Russell submitted two applications to Allianz: the original paperwork signed by Steele on December 8, 2010; and, at Allianz's request, a second application signed on January 7, 2011. Doc. #111-2 at 134:13-15. Believing Russell submitted altered versions of the original application, Allianz's New Business Department referred the matter to the Special Investigative Unit. Doc. #111-9 at 50:8-16.

On January 12, 2011, Romo spoke with Russell by telephone and requested that he send by overnight mail the original, "wet signature" documents dated January 7, 2011. Doc. #122-10 at 4. Instead, Russell made a copy of the January 7, 2011, documents, which Steele signed and dated on January 12, 2011. Doc. #123 at 7. Russell submitted the copy to Allianz and refused to mail the original. Doc. #122-10 at 4. When Romo pressured him to mail the original, Russell told Romo that an attorney told him not to send the original to Allianz. Doc. #122-1 at 137:8-20. Russell later admitted that this statement was untrue, and that he lied because "[i]n truth, Russell had become weary of Romo's incessant questioning about forms and applications and signatures, and expressed his frustration to Romo regarding the entire affair." Doc. #123 at 9.

Steele's application, which was pending at the time that Allianz terminated Russell, was withdrawn prior to policy issuance. Doc. #122-8 at 94:18-22.

### C. Termination and Notice

On January 28, 2011, Allianz sent Russell a letter stating, "We regret to inform you that effective 01/28/2011, your appointment and/or Agent Agreement with Allianz Life Insurance

Company of North America has been terminated for cause." Doc. #36 at Ex. B. The letter did not identify the cause for which Russell was terminated. Russell received the termination letter on January 28, 2011. *Id*. at ¶ 10.

Allianz subsequently notified the Commissioners of Insurance for the states of Mississippi and Arkansas that Russell had been terminated for cause. *Id*. at ¶ 12. In May 2011, Russell received a letter from Chief Investigator Mary Coney of the Arkansas Insurance Department. Doc. #36 at Ex. C. The letter stated:

> The Arkansas Insurance Department received information from Allianz that they had cancelled your appointment with them "for cause." I request that you furnish the Arkansas Insurance Department a written explanation regarding the allegation that you cut and pasted client signatures and dates and/or forged client signatures and dates.

*Id*.

On June 7, 2011, Russell sent a letter to Allianz requesting "in writing the specific details for the reason for Cause why and how [Allianz] came to [its] decision [to terminate him]." Doc. #122-10 at 7. The letter noted that "[a]ccording to the contract … under (K) termination for cause, the last sentence states ALLIANZ has to specify in writing the reason for CAUSE." *Id*.

On August 4, 2011, Allianz sent Russell's Allianz clients a letter informing them of Russell's termination. Doc. #36 at Ex. D. The letter neither stated the reason for Russell's termination nor alleged that Russell was out of business. Doc. #111-2 at 95:17-96:2.

On August 12, 2011, Romo wrote the Mississippi Insurance Department regarding Russell's termination. The letter stated:

> Per your request, I am providing you with a summary of the concerns we experienced with Mr. Russell which led to termination with cause of his Allianz appointment and contract.
>
> 1. Donald Bentley Complaint, received July 8, 2010. Findings include … Russell admitted to signing Mr. Bentley's signature on his delivery receipt …. Russell

initially stated that Mr. Bentley signed the receipt …. Russell did not deliver Mr. Bentley's policy on the date indicated on the receipt. In fact, Russell did not deliver the policy on any date ….

2. Russell altered the date on an application to make it appear as if a new signature was obtained [for] Audra Gaines ….

3. Russell altered the date on an application and replacement form to make it appear as if new signatures were obtained [for] Kay Steele …. This is especially concerning due to the fact that we mailed Mr. Russell a warning letter on September 3, 2010, explaining that any further occurrences of altering dates on a document could impact his Allianz appointment.

Doc. #36 at Ex. E.

On October 19, 2011, Romo sent Russell a letter stating: "You have requested the reason for your termination with cause. The reason is [you c]ommitt[ed] or attempt[ed] to commit fraud against us." *Id*. at Ex. F.

**D. This Action**

Russell filed suit in the Circuit Court of Desoto County, Mississippi, on October 19, 2012. On February 1, 2013, Allianz timely removed the case to this Court. Doc. #1. Russell filed an amended complaint on June 10, 2013. Doc. #36. Russell's amended complaint asserts claims for: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) breach of fiduciary duty; and (4) "intentional interference with business relations." *Id*.

On October 9, 2013, Allianz filed a motion to dismiss all claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Doc. #62. This Court granted Allianz's motion as to the claim for tortious interference arising from alleged interference with prospective and former customers and denied the motion in all other respects. Doc. #106.

On September 19, 2014, Allianz filed the instant motion for summary judgment, seeking judgment as a matter of law on all remaining claims. Doc. #36 at ¶ 25.

# III
# Analysis

## A. Breach of Contract

Under Minnesota law,[1] "[a] claim of breach of contract requires proof of three elements: (1) the formation of a contract, (2) the performance of conditions precedent by the plaintiff, and (3) the breach of contract by the defendant." *Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.,* 756 N.W.2d 907, 918 (Minn. Ct. App. 2008) (citing *Briggs Transp. Co. v. Ranzenberger*, 217 N.W.2d 198, 200 (Minn. 1974)).

Allianz argues that Russell's breach of contract claim must fail because: (1) "Allianz complied with the terms of the Agent Agreement in terminating the agreement for cause as a result of [Russell] having committed fraud against the company" and (2) "[Russell] himself breached the Agent Agreement on several occasions, [which] therefore excused Allianz from further obligation under the contract."[2]  Doc. #112 at 17-18.  Russell responds that Allianz breached the Agreement by: (1) attempting to terminate him for cause without stating the reason for his termination; and (2) attempting to terminate him for fraud even though no fraud occurred. Doc. #123 at 14.

---

[1] The Agreement contains a choice of law clause designating Minnesota law as controlling.  This Court previously concluded:

> Under Mississippi law, where a choice of law provision states an agreement is "governed by" the laws of another state, the law of the selected state applies to contract based claims while tort claims are governed by Mississippi law.  Accordingly, the Court will apply Minnesota law to the claims for breach of contract and breach of the covenant of good faith and fair dealing.  In contrast, the claims for breach of fiduciary duty and intentional interference with business will be analyzed under Mississippi law.

Doc. #106 at 7 (internal citations omitted).

[2] Allianz also notes that "the Agent Agreement allows Allianz to terminate Plaintiff for any reason within 30 days' notice."  Doc. #112 at 2.  To the extent this statement, which appears only in the "Introduction" section of Allianz's memorandum, offers another argument that Russell's breach of contract claim fails, the Court rejects it. Notwithstanding Allianz's failure to cite legal authority or make a substantive argument, the case record reflects that Allianz did not provide thirty days' notice, but rather revoked Russell's agent status effective immediately on January 28, 2011.  Further, Allianz explicitly invoked the "for cause"—rather than "at will"—termination provision in the January 28, 2011, letter.

### 1. Notice of Termination for Cause

"A provision in a contract for the termination thereof upon certain conditions can be enforced only in strict compliance with the terms of those conditions." *Blaine Econ. Dev. Auth. v. Royal Elec. Co., Inc.*, 520 N.W.2d 473, 476 (Minn. Ct. App. 1994) (internal citation omitted). Pursuant to the Agreement, a termination for cause would not be effective until: (1) Russell was convicted of a felony; (2) Russell had his insurance license revoked; or (3) Allianz sent Russell a written notice of termination which specified the reason for termination for cause.

Allianz argues that Russell's termination was effective because adequate written notice was provided by "an October 19, 2011 letter from Gary Romo to [Russell], indicating the basis for [Russell]'s termination for cause in writing." Doc. #112 at 10. Russell does not dispute that the October 19, 2011, letter provided written notice of the reason for termination for cause. Rather, he asserts that it was the *first* instance that Allianz provided such written notice, in that the January 28, 2011, letter purporting to terminate Russell failed to specify the reason for termination for cause. The Court agrees with Russell. Based on the express terms of the agreement and the case record, Russell's termination for cause was not effective until October 19, 2011, when Romo informed Russell that he was terminated for fraud. Nevertheless, before the effective date of Russell's termination, Allianz revoked his ability to act as an agent pursuant to the Agreement. Doc. #36 at ¶ 14.

Viewing these facts in the light most favorable to Russell, the Court concludes that Russell has demonstrated the existence of a contract (the Agreement) and a breach of such contract (Allianz's termination of the Agreement prior to meeting the requirements for termination). There is no indication that the breached notice provision was dependent on a condition precedent. Therefore, summary judgment against Russell's breach of contract claim

on the grounds that Allianz provided proper notice is denied. *See Midwest Sports Mktg., Inc. v. Hillerich & Bradsby of Canada, Ltd.*, 552 N.W.2d 254, 267 (Minn. Ct. App. 1996) (summary judgment against plaintiff inappropriate where defendant failed to comply with contractually required termination notice).

### 2. Fraud

Allianz argues that Russell's termination for cause was proper because he committed fraud against Allianz by making false statements to Romo for the purpose of thwarting his investigation into the Steele matter. Doc. #112 at 18.

The Court's analysis on this issue is two-part: (1) whether Russell committed fraud by making false statements to Romo as alleged; and (2) whether Allianz's decision to terminate Russell relied on those statements. This Court previously concluded that "the plain meaning of fraud as used in the Agreement is (1) a knowing misrepresentation or concealment of a material fact; (2) made to gain an unjust advantage or to induce another to act to its detriment."[3] Doc. #106 at 10. To establish Russell's fraud, Allianz points to Russell's admission regarding the Steele application that he "told Mr. Romo that an attorney told [him] not to send it, and that was an untrue statement[.]" Doc. #111-2 at 137:21-24. Indeed, Russell admits in his responsive brief that he made the false statements purposefully, because he "had become weary of Romo's incessant questioning." Doc. #123 at 9. Allianz asserts, and Russell does not dispute, that these

---

[3] This definition is consistent with Minnesota law, which provides that:

> The elements of fraud are: (1) a false representation by a party of a past or existing material fact; (2) made with knowledge of the representation's falsity or made as of the party's own knowledge without knowing whether it was true or false; (3) with intent to induce another to act in reliance on that representation; (4) the other party acted in reliance on that representation; and (5) the other party suffered pecuniary damage as a result of that reliance.

*Twaiten v. Murphy*, 2010 WL 3220149, at *3 (Minn. Ct. App. Aug. 17, 2010) (citing *Hoyt Props., Inc. v. Prod. Res. Grp.*, L.L.C., 736 N.W.2d 313, 318 (Minn. 2007)).

false statements thwarted Romo's investigation into the Steele matter to Allianz' detriment.  The Court concludes that the undisputed facts show that Russell committed fraud against Allianz by making such false statements to Romo.

Turning to whether Allianz's decision to terminate Russell relied on the false statements, Allianz concludes, without pointing to any evidence, that Russell's untrue statement to Romo "triggered the termination."  Doc. #124 at 2.  Seemingly against his own interest, Russell proffers Romo's testimony that "one of the reasons [he chose to terminate Russell for fraud] was that '[he] d[id]n't believe [Russell] was being very cooperative during the investigation.'"  Doc. #123 at 9.  However, Russell also asserts that the August 12, 2011, letter Romo sent to the Mississippi Insurance Department identifying the reasons for Russell's termination did not mention the alleged false statements to Romo.  Consequently, Russell contends, the false statements are irrelevant to an analysis of whether his termination for fraud was justified.  Doc. #123 at 14.

This Court previously addressed the subject of Allianz's inclusion of false statements by Russell to Romo as a reason for his termination:

> While the August 2011 letter to the Mississippi Insurance Department referenced that "Russell initially stated that Mr. Bentley signed the receipt," the Court has been unable to find anything in the pleadings or attached documents that shows Russell was terminated for any type of "cover-up."  Indeed, it appears that Allianz informed the Arkansas Insurance Department that Russell was terminated for cutting and pasting client signatures and dates.  Doc. # 36 at Ex. C.  In the absence of any indication to the contrary, the Court, for the purposes of deciding the motion to dismiss, draws the reasonable inference that Russell was terminated for the reasons set forth in the Arkansas Insurance Department letter.

Doc. #106 at 10 n.4.  Viewing the facts in the light most favorable to Russell, the Court must once again draw the reasonable inference that Russell was terminated for the reasons set forth in Allianz's letters to the Insurance Departments of Arkansas and Mississippi, which do not

mention the word fraud, and not because Russell was not "being very cooperative during the investigation." The case record does not support the after-the-fact inclusion of a reason for termination that was not expressed at the time of Russell's termination. Therefore, summary judgment against Russell's breach of contract claim on the grounds that Allianz properly terminated Russell for fraud is improper.

### 3. Prior Breach Defense

Minnesota law provides that "a party who first breaches a contract is usually precluded from successfully claiming against the other party." *Carlson Real Estate Co. v. Soltan*, 549 N.W.2d 376, 379 (Minn. Ct. App. 1996) (citations omitted). The first breach must be material in order to excuse performance by the second party. *TC/Am. Monorail, Inc. v. Custom Conveyor Corp.*, 822 N.W.2d 812, 817 (Minn. Ct. App. 2012), *rev'd on other grounds*, 840 N.W.2d 414 (Minn. 2013). "When a material breach of contract occurs, the nonbreaching party may elect to either affirm or rescind the contract." *Busch v. Model Corp.*, 708 N.W.2d 546, 551 (Minn. Ct. App. 2006) (citation omitted).

Allianz argues that "[Russell] himself breached the Agent Agreement on several occasions, [which] excused Allianz from further obligation under the Agreement." Doc. #112 at 18. Allianz contends that Russell materially breached the Agreement by violating the rules and regulations referenced in the Agreement. Specifically, Allianz points to the violations Russell allegedly committed regarding the Bentley, Gaines and Steele policies and that, "in each instance of violations investigated by Allianz, "[Russell] signed documents on behalf of applicants."[4] Doc. #124 at 2.

---

[4] The parties now dispute whether Russell had permission to sign the delivery receipt on Bentley's behalf. Russell notes that in Bentley's May 25, 2012 affidavit, Bentley stated that he "had no problem with Mr. Russell signing any of the forms on [his] behalf." Doc. #122-4 at ¶ 12. Allianz counters that on October 21, 2013, when asked whether

Even assuming that repeated violations of the rules and regulations constitute a material breach of the Agreement, Russell disputes Allianz's allegation that he signed documents on behalf of Gaines and Steele and, consequently, that he violated the rules and regulations.[5] Viewing the evidence in the light most favorable to Russell, the Court concludes that a genuine dispute of material fact remains on this issue. Therefore, summary judgment against Russell's breach of contract claim based on Russell's prior breach is improper.

### B. Implied Covenant of Good Faith and Fair Dealing

Allianz argues that Russell's cause of action for breach of the implied covenant of good faith and fair dealing must fail because he "completely fails to prove any conduct that even remotely approaches bad faith."[6] Doc. #112 at 19.

"Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract." *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn.1995) (internal quotation marks omitted). To establish a violation of the implied covenant of good faith and fair dealing, "a party must establish bad faith by demonstrating that the adverse party ha[d]

---

Russell had permission to sign Bentley's name on the policy delivery receipt, Bentley testified that "[n]o one has permission to sign [his] name." Doc. #111-4 at 24:2-7. Yet shortly thereafter, Bentley testified as follows:

> Q.  So if – and your testimony today, if part of him handling the transaction, if he needed to sign that to just say y'all got the policy, that was okay with you?
>
> A.  With my trust in Mr. Russell, I had no problem with him receiving the policy and – the question you just asked.
>
> Q.  So you didn't have any trouble with him signing on your behalf?
>
> A.  No.

Doc. #122-7 at 37:5-17 (objection omitted). The Court resolves this dispute—as it must—in favor of Russell and finds that he had permission to sign the delivery receipt.

[5] As mentioned above, Russell signed paperwork attesting that he read and understood the rules and regulations. However, Russell later admitted that he did not read the rules and regulations until after Allianz terminated the Agreement. Doc. #111-2 at 33:24-34:23.

[6] Allianz also argues that the cause of action fails because Russell's breach of contract claim fails. Having found summary judgment against Russell's breach of contract improper, the Court need not address this argument.

an ulterior motive for its refusal to perform a contractual duty." *Minnwest Bank Cent. v. Flagship Props. LLC*, 689 N.W.2d 295, 303 (Minn. Ct. App. 2004) (citing *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998)). The test for bad faith is not objective reasonableness, but rather subjective motivation. *BP Prods. N. Am., Inc. v. Twin Cities Stores, Inc.*, 534 F. Supp. 2d 959, 966-68 (D. Minn. 2007) (applying Minnesota law) ("[Defendant]'s pricing decisions could not breach the implied covenant of good faith and fair dealing—even if they were objectively unreasonable—unless those decisions were made dishonestly, maliciously, or otherwise in subjective bad faith."); *see also Sterling Capital Advisors, Inc.*, 575 N.W.2d at 125 ("Actions are done in good faith when done honestly, whether it be negligently or not.").

Russell asserts that Allianz acted in bad faith by: (1) "hounding [Russell] over what amounted to minor errors in paperwork"; (2) terminating Russell for "what [Allianz] perceived as a lack of cooperation on his part to the [Steele] investigation"; (3) "sen[ding] Bentley an Affidavit of Forgery"; and (4) terminating Russell for fraud in spite of an internal memorandum describing Russell's actions as "not fraud." Doc. #123 at 117-18. Allianz does not dispute the underlying actions listed, only the manner in which Russell characterizes them. Even viewing the facts in the light most favorable to Russell, none of these actions evidence bad faith, that is, an ulterior motive by Allianz not to perform under the Agreement.

First, Allianz's stated reason for "hounding" Russell was that it had legitimate concerns that annuity policy paperwork submitted by Russell evidenced signs of altered dates and copied signatures. *See* Section II.B., *supra*. While there is a dispute between the parties as to the actual existence of fraud, Russell offers no evidence to show Allianz had an ulterior motive when it investigated and subsequently terminated him for the stated reason of fraud.

As to Russell's second bad faith argument regarding lack of cooperation, Romo testified that his investigation found that Russell "repeatedly failed to comply with our rules and regulations," and "falsif[ied] and omit[ted] material information provided to [Allianz]." Doc. #122-8 at 59:1-9. Romo explained his eventual decision to terminate based on fraud:

> A. The reason I would recommend k(8) is because in my mind the committing or attempting to commit fraud against us, although it does contain some of these other elements that could fit in these other categories, that's more of the top level infraction in my mind, that's what I was investigating, I'm a fraud investigator. To me that seemed to be, lack of a better word I guess, catch-all, but that seemed to fit the best.
>
> * * *
>
> Q. Did you choose that k(8) because it was more severe than the other possible reasons?
>
> A. No. I think – I think ultimately k(8) in my mind is, it just seemed to fit better with the infractions. I really felt that Mr. Russell was trying to lie to the company and then also I don't believe he was being very cooperative with me as well during the investigation.

Doc. #122-8 at 59:14-60:11. This testimony suggests that Romo viewed termination for fraud as a "catch-all" provision that included all of Russell's actions, including his lack of cooperation. It does not suggest, nor does Russell offer any evidence to show, that Allianz terminated Russell solely for his lack of cooperation during the investigation or that Romo chose fraud in bad faith.[7]

As for Russell's third bad faith argument, Romo sent Bentley the affidavit of forgery on June 29, 2010, as part of his investigation into a discrepancy over whether Bentley or Russell had signed a policy delivery receipt. *See* Section II.B.1, *supra*. When asked whether he had ever sent an affidavit of forgery to anyone else, Romo testified that he had. Doc. #122-8 at 75:5-7. Russell offers no evidence to suggest that Romo's actions were dishonest, malicious (e.g., not in compliance with Allianz practice), or otherwise executed in subjective bad faith.

---

[7] The Court also notes that the next question during the deposition referenced the Bentley, not Steele, investigation, suggesting that Romo used the word "investigation" to refer to his cumulative investigation of Russell, not merely the Steele matter. *Id.* at 60:12-13.

As for Russell's fourth bad faith argument, Romo wrote the "not fraud" statement in the internal Allianz memorandum with regard to the Bentley matter,[8] and not, as Russell suggests, as to all matters central to his termination. As already discussed at length, Allianz contends that it terminated Russell for fraud committed with regard to three customers—Bentley, Gaines, and Steele—not just one. Russell's unsubstantiated conjecture that Allianz concluded Russell committed no fraud but nevertheless terminated him for fraud is without merit and offers no evidence of bad faith.

For these reasons, the Court finds that Russell has failed to establish that Allianz acted in bad faith. Therefore, the Court grants Allianz's motion for summary judgment against Russell's claim for breach of the implied covenant of good faith and fair dealing.

### C. Breach of Fiduciary Duty

To make a claim for breach of fiduciary duty under Mississippi law, a plaintiff must show the existence of a fiduciary duty and a breach of such duty. *See Lowery v. Guar. Bank and Trust Co.*, 592 So. 2d 79, 83 (Miss. 1991) ("A fiduciary duty must exist before a breach of the duty can occur."); *AmSouth Bank v. Gupta*, 838 So. 2d 205, 216 (Miss. 2002) ("The party asserting the existence of a fiduciary relationship bears the burden of proving its existence by clear and convincing evidence."). "Ordinarily, [Mississippi] does not impose fiduciary duties upon parties to a contractual agreement, but in some rare cases the terms of the contract itself create a fiduciary relationship." *Robley v. Blue Cross/Blue Shield of Mississippi*, 935 So. 2d 990, 994-95 (Miss. 2006). This Court previously concluded that, as pled, the Agreement created a fiduciary

---

[8] The statement reads in full: "Report to fraud bureau/law enforcement as required- 8/19/10 - not fraud, consumer authorized him to sign the delivery receipt[.]" Doc. #122-10 at 1. The entry date, August 19, 2010, corresponds to the date Romo mailed Russell a warning letter regarding the Bentley matter and predates the Gaines and Steele investigations by one week and nearly four months, respectively. *See generally* Section II.B, *supra*.

relationship between Russell and Allianz under Mississippi law.  Doc. #106 at 14.  Allianz now challenges only the alleged breach of that duty and resulting damages.  Doc. #112 at 21-22.

Allianz argues that because "[its] conduct was entirely in conformance with the terms of the Agent Agreement, … Russell's breach of fiduciary duty claim fails as a matter of law."  In the alternative, Allianz contends that "there is no evidence of any causal connection between any alleged breach of fiduciary duty and the damages [Russell] claims," and thus, Russell's breach of fiduciary duty claim fails as a matter of law.  Having already found summary judgment against Russell's breach of contract claim improper, the Court will consider only Allianz's alternative argument.

Under Mississippi law, "a breach of [fiduciary] duty arises when one party breaches the other's trust or confidence by affirmatively acting in a way that produced the other party's loss." *Carter Equip. Co. v. John Deere Indus. Equip. Co.*, 681 F.2d 386, 392 (5th Cir. 1982).  To find the breaching party liable for the other party's loss, the other party must show that the breach caused the alleged damages.  *Callicutt v. Prof'l Servs. of Potts Camp, Inc.*, 974 So. 2d 216, 221 (Miss. 2007); *see also Crist v. Loyacono*, 65 So. 3d 837, 842-43 (Miss. 2011) (Regarding "an allegation of breach of fiduciary duty, the plaintiff must establish … that the breach proximately caused the injury ….").

In his response, Russell argues that Allianz's decision to terminate the Agreement for cause breached its fiduciary duty to Russell and caused the loss of "hundreds of Allianz customers (and thus many renewals and referrals)."  Doc. #123 at 21.  Russell testified that the August 4, 2011, letter sent by Allianz, which notified his customers that he had been terminated, caused them to believe that he was no longer in business.  Doc. #122-1 at 151:7-19.  He contends

that, as a result of his termination, he lost the business of all 216 customers who had active Allianz policies as of January 16, 2011. Doc. #122-17.

Allianz counters that Russell "cannot point to a single customer he lost … as a result of the Allianz termination" because he was still able to write new policies and contact all of his previous Allianz customers. Doc. #124 at 10. Allianz also disputes Russell's testimony that his lost business was caused by his termination for cause and the subsequent letter to his customers. Allianz asserts that such causation fails because termination under the "at will" provision, which was a viable option, would have resulted in the same damages. Doc. #112 at 11.

Viewing these facts in the light most favorable to Russell, the Court finds that a genuine issue of material facts exists as to the causation and existence of damages arising from Allianz's breach. Because causation is generally a question of fact,[9] and because the Court must resolve factual controversies in favor of the nonmoving party, summary judgment against Russell's breach of fiduciary duty claim is improper.

### D. Tortious Interference with Business Relations

On September 12, 2014, this Court granted Allianz's motion to dismiss Russell's claim for tortious interference with business relations arising from alleged interference with prospective and former customers, finding that Russell had not pled that Allianz's actions diverted customers. The Court denied the motion as to business relations between Russell and other insurance companies, concluding that Russell stated a claim that "due to the termination, he lost two contracts, and was unable to 'gain a similar agency status' with another company." Doc. #106 at 16.

---

[9] *Rein v. Benchmark Constr. Co.*, 865 So. 2d 1134, 1143 (Miss. 2004) ("While duty and causation both involve foreseeability, duty is an issue of law, and causation is generally a matter for the jury.").

Allianz now moves for summary judgment against the remaining tortious interference claim, arguing that Russell's deposition testimony shows that he "did not lose two contracts, but rather had to re-apply to two companies whose contracts lapsed because they were placed through Allianz' affiliated FMO." Doc. #112 at 22. Allianz also points to evidence that Russell was appointed by a third insurance company two months after his termination from Allianz. *Id.* at 23.

Russell neither addresses Allianz's arguments nor offers rebuttal evidence.[10] "If a party … fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: … consider the fact undisputed for purposes of the motion [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e); *see also Puga v. Travelers Ins.*, 58 F.3d 635, 635 (5th Cir. 1995) (finding plaintiff waived argument because she did not argue issue in her brief in opposition to summary judgment). The Court does so here. Given that Allianz's allegations regarding Russell's agency status are undisputed, Allianz is entitled to judgment as a matter of law against Russell's remaining tortious interference with business relations claim.

## IV
## Conclusion

For the reasons set forth above, the motion for summary judgment [111] is **GRANTED in Part and DENIED in Part**. The motion is granted as to (1) the claim for breach of the implied covenant of good faith and fair dealing; and (2) the remaining claim for tortious interference with business relations. The motion is denied in all other respects.

---

[10] In fact, Russell's memorandum omits the tortious interference with business relations claim altogether:

> Lastly, it should be noted that breach of contract is only one of three causes of action which currently remain viable in this action against the Defendants, with the other two being a breach of the Implied Covenant of Good Faith and Fair Dealing, as well as a Breach of Fiduciary duty.

Doc. #123 at 23.

SO ORDERED, this the 31st day of December 2014.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**