# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# OXFORD DIVISION

**DUGAN CALVIN RUSSELL**                                                                       **PLAINTIFF**

**V.**                                                                  **NO. 3:13-CV-00030-DMB-JMV**

**ALLIANZ LIFE INSURANCE
COMPANY OF NORTH AMERICA;
LTCAMERICA INSURANCE
COMPANY; LIFE INSURANCE USA
COMPANY; and XYZ CORPORATIONS
1-50**                                                                              **DEFENDANTS**

## ORDER ON MOTION TO EXCLUDE
## OPINION TESTIMONY OF ROBERT VANCE

Defendants Allianz Life Insurance Company of North America, LTCAmerica Insurance Company, and Life Insurance USA Company (collectively, "Allianz") have moved to exclude the opinion testimony of Plaintiff's damages expert, Robert Vance, as speculative and unreliable. Doc. #109. Upon consideration, for the reasons below, Vance's opinion testimony should be excluded.

## I
## Standard on Admissibility of Expert Testimony

Rule 702 of the Federal Rules of Evidence allows opinion testimony from "a witness who is qualified as an expert by knowledge, skill, experience, training, or education," but only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court interpreted Rule 702 and "assigned to trial courts the responsibility of

determining whether expert testimony under Rule 702 is not only relevant, but reliable." *Hathaway v. Bazany*, 507 F.3d 312, 317 (5th Cir. 2007) (internal quotation marks omitted). A trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. Commensurate with this duty, a trial court is given "wide latitude in determining the admissibility of expert testimony." *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 514 (5th Cir. 2013) (citing *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009)).

When considering reliability, *Daubert* dictates that trial courts should consider "the extent to which a given technique can be tested, whether the technique is subject to peer review and publication, any known potential rate of error, the existence and maintenance of standards governing operation of the technique, and, finally, whether the method has been generally accepted in the relevant scientific community." *Hathaway*, 507 F.3d at 318. The *Daubert* factors "are not mandatory or exclusive." *Id*. Rather, the trial court should consider whether the enumerated factors "are appropriate, use them as a starting point, and then ascertain if other factors should be considered." *Id*. (citing *Black v. Food Lion*, 171 F.3d 308, 311–12 (5th Cir. 1999)).

Because Plaintiff seeks to introduce Vance's opinion as expert testimony, Plaintiff bears the burden of proving "by a preponderance of the evidence that the proffered testimony satisfies [Rule 702]." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)). Though Plaintiff "need not prove to the judge that the expert's testimony is correct," he must prove that the testimony is reliable and that "the expert's reasoning or methodology can be properly applied to the facts in issue." *Johnson v. Arkema*,

*Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal citations omitted). Plaintiff cannot simply rely on his expert's assurances that he has utilized generally accepted scientific methodology. Rather, some objective, independent validation of the expert's methodology is required. *Matosky v. Manning*, 428 Fed. App'x 293, 298 (5th Cir. 2011) (citing *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)); *see also Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (holding that in order to be admissible, proffered expert testimony "must be grounded in the methods and procedures of [the relevant discipline] and must be more than unsupported speculation or subjective belief"). "Under *Daubert*, any step that renders the analysis unreliable renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Ashland Chemical*, 151 F.3d at 278 n.10 (internal quotation marks and ellipsis omitted).

## II
## Vance's Report

Russell's retained expert, Robert Vance, of Forensic & Valuation Services, is a certified public accountant who specializes in business valuation and forensic accounting. Vance's curriculum vitae reflects many years of experience in his field and his previous qualification as an expert witness in state courts in Tennessee, Arkansas, Mississippi, and Florida, as well as in the United States District Court for the Western District of Tennessee. Doc. #115-6 at 9-11. Allianz does not challenge Vance's qualifications as an expert in business valuation and forensic accounting.

Russell seeks to rely on Vance's opinion testimony to provide a calculation of profits he allegedly lost due to the termination of his Agent Agreement with Allianz. Doc. #116 at 3. To that end, Vance performed a forensic accounting analysis of Russell's alleged lost profits over a period of ten years after termination, from 2012 to 2020, and summarized his findings in a

report. Doc. #115-6. To calculate such lost profits, Vance: (1) analyzed Russell's "historical gross revenues from commissions, the related business expenses and resulting net profits" for the period 2005-2012; (2) determined that Russell had a work-life expectancy of ten years; (3) used data reporting the sales of annuities on a national level from the Insured Retirement Institute ("IRI") as an industry yard stick to project Russell's future annual gross commission income; and (4) valued Russell's "book of business" at 1.5 times the projected gross commission income for the year 2020. *Id*. at 3-5.

Using these assumptions and data, Vance calculated Russell's alleged lost profits per year as summarized in his report:

> In order to project the loss of future gross commission income, we used the 2010 gross of $116,544 as the base year (the year immediately before termination), and increased the base .4% for 2011, .4 % during 2012 and .9% for the remainder of the work life through 2020. The projections terminate in 2021 with the sale of the book of business for 1.5 times the projected 2020 gross commissions. We deducted business expenses of 61.5% from the projected gross commissions for the years 2011-2020. The *Total Projected Net Profit*, including the sale, was $656,391. We deducted the actual mitigating earnings for 2011 and 2012 and used 2012 as a basis for years 2013-2020 for a total of $101,940. The resulting *Loss of Future Profits* after deducting mitigating earnings is $554,452. We discounted the *Loss of Future Profits* each year using a 2.64% rate which was derived from the 10-year Treasury Bond safe rate as of 7/12/13. The income projection figures have effectively been risk-adjusted, since this book of business has grossed much more in the past, and the level projected requires only 2-3 annuity sales or renewals per month, among other reasons, thus the current safe rate is used. The *Present Value of Loss of Future Profits* is $486,313, which, accordingly, is our conclusion as to the loss of profits due to the alleged wrongful termination of the Plaintiff.

*Id.* at 5.

### III
### Analysis

Allianz has moved to exclude the opinion testimony of Robert Vance as speculative and unreliable on the grounds that Vance: (1) improperly assumes the existence and value of a saleable "book of business" in contravention of stated methodology; (2) grossly over-estimates

4

Russell's work-life expectancy in contravention of stated methodology; (3) fails to account for the downward trend in Russell's income from 2007-2010; (4) claims that Allianz's termination caused Russell's customer base to decline but is unaware of any supporting data; (5) fails to account for Russell's post-termination appointment and termination from another annuity carrier; and (6) fails to account for the at-will termination provision in the Agent Agreement. Doc. #110.

### A. Book of Business

Of the estimated $486,313 total lost profits, Vance attributes $151,700 to the sale of Russell's book of business[1] in the year 2021. Doc. #115-6 at 5. In formulating the value of Russell's book of business, Vance compared Russell's business to the annual revenues and sale prices of insurance agencies similar in size to that of Russell's business, then calculated the value of Russell's business relative to these agencies. Doc. #109-1 at 60:15-62:9. Based on this comparison method, he concluded that Russell's business should be valued at 1.5 times the projected gross commission income for the year 2021. *Id.* at 60:7-14. However, Vance noted that the valuation multiplier of Russell's business could fall anywhere in the range of 1 to 3 times the projected gross commission income for the year 2021. *Id.* at 63:1-4.

Allianz argues that Vance's method of appraising Russell's book of business fails to use reliable principles and methods and is not based on sufficient facts and data for his opinion to constitute an accurate portrayal of lost profits. Doc. #110 at 9-10. Allianz points out that Vance admits he did not perform an actual business valuation of Russell's business, and further contends that Vance's comparison method of valuation is unreliable because Russell's annuity

---

[1] Vance explained during deposition his definition of Russell's "book of business":

> A. No, because the sale of the book of business would have been his reputation, that, you know, I'm going to sell you my book of business, I will transition the customers to you …. It's a customer list, which is a lot of it.

Doc. #110-1 at 78:16-79:2.

5

book of business is grossly dissimilar from books of business for other insurance products—which were the basis of Vance's comparison. *Id*. at 5-7. Finally, Allianz argues that although Vance claimed that the value of a book of business is derived from an agent's reputation and customer list, he admitted that he did not analyze how Russell's customer list was affected by Allianz's termination. *Id*. at 9. Consequently, Allianz asserts, Vance simply assumed Russell lost his entire client list—an assumption belied by Russell's testimony that post-termination he sold insurance products through other carriers to individuals on his client list. *Id*. at 9-10; Doc. #121 at 4.

The Fifth Circuit has provided guidance regarding a trial court's inquiry into the data underlying opinion testimony:

> As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration. In some cases, however, the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion. Expert opinion testimony falls into this category when that testimony would not actually assist the jury in arriving at an intelligent and sound verdict.

*Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (internal citation omitted).

Here, as was the case in *Viterbo*, the opinion testimony is fundamentally unsupported and therefore can offer no expert assistance to the jury. First, Vance relies on Russell's assertion that he lost his entire book of business as a result of Allianz's termination. Even assuming such oral testimony is generally considered reliable, Russell's testimony lacks reliability because it was incomplete in a critical area. In forming his opinion, Vance was not aware of the undisputed fact that Russell continued to sell insurance products to at least some of the individuals on his client list through other insurance carriers. Vance based his belief that Russell's customer base ceased to exist after the termination solely on Russell's testimony and business revenue, and did not examine the client list before and after the termination. Doc. #109-1 at 38:7-39:6 ("I don't think

I have the customer -- the actual commission list, if you will. I mean, the proof is in the pudding as they say. The gross revenues dropping substantially …. I don't think I had that information.").

Next, Vance relied on the comparison analysis he conducted. Russell admits that the specific insurance agencies surveyed by Vance to determine the value of Russell's book of business were "inadvertently lost." Doc. #116 at 8. Russell reiterates the comparison methodology Vance used to value Russell's business, but does not offer evidence to refute Allianz's contention that the insurance agencies used for comparison were not sufficiently similar with regard to the insurance products sold. Russell concludes, without offering evidence, that the agencies were "similar in nature, scope and size to that of [Russell's]." Doc. #116 at 9. And, while Russell attached as an exhibit to his brief in opposition a print-out from the website from which Vance allegedly found these comparable agencies, the document lists only one property and casualty insurance agency based in Avondale, Arizona with listed revenue of $70,000 and a sale price of $125,000. Doc. #115-11 at 3. This agency seemingly does not sell annuities, and has annual revenue comparable to Russell's business only as to the year 2011.[2] These disparities would be immaterial were Russell to prove by a preponderance of the evidence that Vance's comparison methodology nevertheless complied with reliable scientific methodology. Russell offers no such evidence.

In sum, Vance's lost profits opinion rests on Russell's statements that he lost his entire book of business and on a comparison to other insurance agencies—the data for which have since been lost, such that the comparison analysis cannot now be reviewed nor attacked through

---

[2] Vance's report lists Russell's annual revenue as follows: 2005, $197,455; 2006, $199,626; 2007, $196,984; 2008, $179,340; 2009, $112,199; 2010, $116,544; 2011, $69,981; 2012, $26,154. Doc. #115-6 at 6. Notably, Vance bases his lost profits calculation on the 2010 revenue ($116,544), not the 2011 revenue ($69,981) that is comparable to the agency listed in Exhibit 11. *Id*. at 5.

7

vigorous cross examination at trial. This opinion simply lacks the foundation and reliability necessary to support expert testimony. As the Fifth Circuit stated in *Viterbo*: "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." 826 F.2d at 423. The Court finds that Vance's opinion testimony regarding Russell's book of business is not reliable under Rule 702.

### B. Work-Life Expectancy

At the time of the termination of the Agent Agreement, Russell was seventy years old. Doc. #116 at 9. The lost profits calculated by Vance assume Russell's work-life expectancy at age seventy to be ten years. Doc. #115-6 at 3. The report bases this assumption on Russell's testimony that he was in good health, loved his work as an insurance agent, and viewed such work as "retirement work." *Id*.

Allianz argues that Vance improperly based Russell's work-life expectancy on Russell's testimony rather than on an objective standard, such as the work-life expectancy study published by James Skoog and James Cieka ("Skoog-Cieka study"). Doc. #110 at 11-13. Allianz asserts that Vance admitted he did not consult the Skoog-Cieka study in estimating Russell's work-life expectancy. *Id*. at 11 (citing Doc. #109-1 at 58:21-59-18). Consequently, Allianz contends, Vance's opinion is not based on an objective standard as required by Rule 702.

Russell responds that Vance took into account subjective factors specific to Russell—"current situation, health, hopes, abilities and the nature of the work itself"—when generating his opinion as to work-life expectancy, which account for the large divergence from the objective standard. Doc. #116 at 9. Russell also points to Vance's testimony that certain studies have proven that a self-employed person will work longer. *Id*. at 10. However, Vance admits that he did not use those studies in calculating Russell's work-life expectancy. Doc. #109-1 at 59:19-

60:5.  Russell points to no case law to support his contention that Vance may consider subjective factors in lieu of an objective standard.

"Generally, federal courts apply their own evidentiary rules in diversity matters." *King v. Illinois Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003) (citing *Washington v. Dep't of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993)).  Accordingly, "the Federal Rules of Evidence control the admission of expert testimony." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459 (5th Cir. 2002).

The Fifth Circuit has held that a plaintiff's work-life expectancy should be based on statistical averages, such as those provided by the Department of Labor's work-life expectancy tables. *Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475, 478 (5th Cir. 1984).  The Fifth Circuit explained:

> The phrase "work-life expectancy" literally reflects its meaning: the average number of years that a person of a certain age will both live and work.  Such an average is not conclusive.  It may be shown by evidence that a particular person, by virtue of his health or occupation or other factors, is likely to live and work a longer, or shorter, period than the average.  Absent such evidence, however, computations should be based on the statistical average.

*Id.*  In *Madore*, the court held that because no particularized evidence existed to contradict the Department of Labor statistical average assigning the plaintiff a work-life expectancy of fewer years, the district court erred in concluding the plaintiff could be anticipated to work beyond the statistical average. *Id*.

Applying the holding in *Madore*, a district court in this circuit recently held that an expert's opinion on work-life expectancy was not based on reliable methodology in the absence of "alternative evidence show[ing] that Plaintiff's personal characteristics – including his health, occupation, or other facts – are likely to give him a longer work life expectancy than the rate provided by the Department of Labor's statistical tables." *Naquin v. Elevating Boats, LLC*, No. 10-4320, 2012 WL 1664257, at *6 (E.D. La. May 11, 2012) (internal citation omitted).  The

court in *Naquin* also held that self-serving testimony regarding the fact that a plaintiff intends to work beyond the statistical average is not sufficient alternative evidence. *Id*.

Here, Vance testified that he typically uses the Skoog-Cieka study—which is "based on Bureau of Labor statistics and other Census Bureau data"—to determine work-life expectancy, but that he did not do so in this case because Russell exceeded the maximum age listed in the study, which he said "may not even go as high as seventy." Doc. #109-1 at 58:17-59:18. The Skoog-Cieka study contains tables that list work-life expectancy based on gender, age, education, and work experience.[3] Doc. #109-5. Notably, each of the work-life expectancy tables lists a maximum age of seventy-five. *Id.* at 20-58. The mean work-life expectancy at age seventy for a male with a high school diploma is 3.74 years, and the median is 2.5 years. *Id.* at 22.

During his deposition, Vance testified that, in addition to Skoog-Cieka, there are tables based on studies of self-employed individuals. Doc. #109-1 at 59:19-24. Although he could not recall the names of the relevant documents, Vance "recall[ed]" that the tables showed self-employed individuals "typically work five to ten years longer than the work life expectancy tables." *Id*. While Vance relied on these tables in other cases, he did not utilize them in determining Plaintiff's work-life expectancy. *Id.* at 60:1-4. Instead, Vance testified, he relied on Russell's testimony regarding Russell's intention to continue working and his observation that Russell physically appeared to be in good health. Doc. #115-10 at 31:16-32:9.

---

[3] Russell observes that the authors qualify the study's calculations, stating that additional factors may impact labor force participation. Doc. #116 at 11 (citing Doc. #109-5 at 6–7). He contends that this admission justifies Vance's failure to use the study entirely. Doc. #116 at 11. This argument misapprehends the purpose of work-life expectancy. Without a doubt, actual labor force participation varies by person based on subjective factors. The Skoog-Cieka study does not suggest that every person will enter and exit the labor force at the exact same times. Instead, the study provides an objective estimate of work-life expectancy based on extensive population data, categorized by key factors.

Vance's failure to utilize the Skoog-Cieka study as an objective standard for estimating Russell's work-life expectancy does not, by itself, make his findings unreliable. Rather, the problem with Vance's report is that he also failed to use *any* objective standard, including the self-employed work-life expectancy studies that he claimed to have used in other cases.[4] In light of Vance's reliance on Russell's self-serving testimony, and in the absence of any indication as to how Vance might otherwise have arrived at his work-life expectancy opinion, the Court is left with no basis from which it can conclude that Vance's ten-year estimate of Russell's work-life expectancy—nearly three times that suggested by the Skoog-Cieka study—is based on reliable methodology. Accordingly, the Court concludes that Vance's opinions based on this assumption are unreliable under Rule 702.

Based on the above, the Court is not assured that the proffered opinion testimony of Robert Vance meets the reliability requirement of Rule 702. Vance's opinion as to Russell's alleged lost profits is based on the assumption that, at the time of Allianz's termination, Russell had a work-life expectancy of ten years. Having found that assumption unreliable, the Court concludes that Vance's work-life expectancy assumption renders Vance's testimony inadmissible. *See* Section I above, citing *Ashland Chemical*, 151 F.3d at 278 n.10 ("Under *Daubert*, any step that renders the analysis unreliable renders the expert's testimony inadmissible."). Accordingly, Vance will be precluded from opining about Russell's lost profits damages.

---

[4] The Court notes that the tables may not be used as retroactive justification for Vance's opinion. *See Kozak v. Medtronic, Inc.*, 512 F. Supp. 2d 913, 916 (S.D. Tex. 2007) (rejecting "post hoc rationalization" of expert opinion).

## IV
## Conclusion

For the reasons set forth above, the Motion to Exclude Opinion Testimony Of Robert Vance [109] is **GRANTED**.

SO ORDERED, this the 8th day of January, 2015.

/s/ **Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**